(No. 22851.—

THE PEOPLE OF THE STATE OF ILLINOIS, Defendant in Error, *vs.* JOSEPH MAJCZEK *et al.* Plaintiffs in Error.

*Opinion filed April 17, 1935.*

W. W. O'BRIEN, THOMAS J. McCORMICK, and JAMES C. RENZINO, for plaintiffs in error.

OTTO KERNER, Attorney General, THOMAS J. COURTNEY, State's Attorney, and J. J. NEIGER, (EDWARD E. WILSON, HENRY E. SEYFARTH, and JOHN T. GALLAGHER, of counsel,) for the People.

Mr. JUSTICE FARTHING delivered the opinion of the court:

Joseph Majczek and Theodore Marcinkiewicz were indicted in the criminal court of Cook county for the murder of William D. Lundy. Upon a trial a jury found them guilty and they were sentenced to imprisonment in the penitentiary for the term of ninety-nine years. The case is here by writ of error.

Two men armed with revolvers entered the grocery store of Mrs. Vera Walush, 4312 South Ashland avenue, in Chicago, at about 3:00 o'clock in the afternoon of December 9, 1932. Mrs. Walush lived in the rear of the store. There was a direct entrance from the store to the kitchen through a half wood and half glass door. The day was very cold, the store was unheated and the windows were frosted but the kitchen was warm. Mrs. Walush, her small daughter, officer Lundy, and John Zagata, who had delivered coal at the premises, were in the kitchen when the two men entered the store. On hearing the store door open Mrs. Walush went into the store from the kitchen. One of the two men ordered her to raise her hands. Then they pushed her back inside the kitchen. One robber put his head inside the kitchen door and saw the police officer and called out, "Duck." The police officer, who was seated at a table with Zagata, got up, and in the struggle which followed the officer was shot. Zagata heard the command to Mrs. Walush, saw the two men advance to the doorway, draw their revolvers and stoop down. As the struggle and shooting began Mrs. Walush ran into a closet, her daughter into a bed-room and Zagata out through a side door of the

kitchen. He later returned through the front door. Joseph Becker, a postman, was on the street. He heard shots and a scream and ran to the store. Two men ran out when he was about ten or twelve feet from the door. They drove away in an automobile. Police officer Lundy's body lay near the front door in the store. Becker called the police department.

Mrs. Walush testified that Majczek was the one who ordered her to raise her hands and announced that it was a "stick-up." She saw the beginning of the struggle and saw both Majczek and Marcinkiewicz shoot the police officer. She came from the closet in time to see the men leave. Mrs. Walush had met Marcinkiewicz three times and had known him for about six weeks. Although the day was dark she positively identified the plaintiffs in error as the murderers. Zagata and Becker were unable to identify them. They did not see their faces clearly, but, according to Zagata, they were large men and wore chinchilla coats and soft, felt, white hats. Becker said that one was tall and thin and the other short.

Mrs. Bessie Barron, an acquaintance of Mrs. Walush and Marcinkiewicz, testified that in a conversation with the latter in the preceding October he asked her if Vera (meaning Mrs. Walush) had any money, and that he was short of money and was "going to make a joint." She afterward pointed out Marcinkiewicz to Mrs. Walush and thereafter introduced them. Subsequently Marcinkiewicz told the witness where Mrs. Walush kept her money, and said that he needed $1500 badly and was "going to make the joint." Mrs. Barron occupied a part of a building owned by Marcinkiewicz's father.

Bruno Uginchus, who knew Marcinkiewicz, testified that on the night of December 9, 1932, at about 6:00 o'clock, he was driving a Ford automobile and met Marcinkiewicz, who told him that he had a little trouble and asked the witness to drive him to Forty-seventh and Wood

streets. He rode on the running-board to that point and went into a saloon.

There were seven bullet holes in the chest, abdomen and hips of the deceased, Lundy. His revolver was loaded and had not been fired.

Majczek and Marcinkiewicz were, respectively, twenty-four and twenty-five years of age. Their defense was an alibi. Three witnesses testified to seeing Majczek at his home at about 3:00 o'clock on December 9, 1932. It was testified that he assisted his father-in-law, who lived in the same building, in carrying in some coal. The coal dealer who delivered the coal testified that he saw Majczek at about 3:00 o'clock, and that he gave Majczek's father-in-law a receipt for one ton of coal. He exhibited a duplicate of that receipt in court. Six witnesses testified to seeing Marcinkiewicz at about the hour the crime was committed. A neighbor of Marcinkiewicz testified that the latter was at the home of the witness helping thaw out a frozen pipe from 1:30 or 2:00 o'clock until about 3:00 o'clock. He then left and went to his home to obtain a blow-torch but did not return. His step-mother, two aunts, and a man who had called to see the father of Marcinkiewicz, who was ill, all testified that Marcinkiewicz was at home at about 3:00 o'clock, and two of them testified that about ten or fifteen minutes thereafter he went across the street to a saloon. The saloon-keeper and a customer testified that Marcinkiewicz was at the saloon at about 3:10 or 3:15 o'clock and remained there until about 6:00 o'clock.

Majczek was arrested early in the morning of December 23, 1932. The police found him behind a bed. Officers went to the home of Marcinkiewicz the night the crime was committed and also the following morning. He surrendered on January 26, 1933.

Majczek did not testify. Marcinkiewicz testified to the same facts related by the other witnesses who told of seeing him at 3:00 o'clock and thereafter on the date of the

murder. He stated that he had a conversation with Uginchus that night, and the latter told him that Mrs. Barron had been arrested and that police officers were at his home. The witness said, "It seems like I have a little trouble," and told Uginchus, who said he was going to the police station, that he would be at a designated saloon and asked Uginchus to return to the saloon and tell him "what it was all about." He testified that he borrowed an overcoat because his was soiled, and he was going to act as sponsor for a boy who was to be confirmed at church that night. He went to the church and afterward called on a girl friend and then went to the home of Majczek, where he and Majczek remained together that night, the following Saturday and Sunday nights, and until Monday, when they talked to a lawyer. He then went to another address. He said it was merely a coincidence that he went to Majczek's home, which was about two and a half miles from his home. His explanation of Mrs. Barron's testimony as to his saying that he was going to "make the joint" is that he told her he wished to "make her," apparently meaning to make the acquaintance of Mrs. Walush. A witness for the defense testified that Mrs. Walush once addressed him as Teddy Marcinkiewicz and he told her that was not his name. Mrs. Walush on her cross-examination had previously stated that she addressed a man once, saying, "You are Teddy Marcinkiewicz's friend." One witness testified to Marcinkiewicz's good reputation.

The errors relied upon are, that the identification was insufficient; that the verdict was contrary to the weight of the evidence and that the evidence does not sustain the conviction; that the verdict was the result of passion and prejudice, and that the court erred in ruling upon evidence and made prejudicial remarks.

The testimony of the three witnesses who were present when officer Lundy was killed is not in entire harmony as to all the details surrounding the commission of the crime,

first, as to the place of the encounter, and secondly, as to the postman's contact with the two men. Mrs. Walush testified that the struggle and some of the shooting began in the kitchen but that the police officer fell in the store. She testified that the two men pushed the postman aside as they ran out and he was about to enter. Zagata testified that the men came toward the kitchen but they were not inside that room and that the struggle and shooting occurred in the store. The body of the police officer lay about a foot inside the front entrance of the store, which is about twenty feet in length. The postman testified that he was ten or twelve feet from the door, on the outside, as the two men ran from the store. They went somewhat diagonally in the direction he was going. The identification of the plaintiffs in error by Mrs. Walush was positive. There was evidence of an intention by Marcinkiewicz to rob her store. One witness said Marcinkiewicz stated he was short $1500 and needed the money badly, and said he knew where Mrs. Walush kept her money and was "going to make the joint." On the night the crime was committed he told a witness that it seemed as if he was in a little trouble, and he thereafter remained away from home for over six weeks and until after his indictment. His father had been sick for some time and he looked after certain properties for his father and collected rent. During the last mentioned period Marcinkiewicz's father died, and the plaintiff in error was not at home at that time and was not present at the funeral. He testified that he did not know his father had died.

We have detailed some of the evidence because it is argued that the discrepancies mentioned affect the question of identity. The testimony of one witness may be sufficient upon the question of identity. (*People* v. *LeMar,* 358 Ill. 58.) Even though denied by the accused, the testimony of one witness may be sufficient to sustain a conviction. (*People* v. *Fortino,* 356 Ill. 415; *People* v. *Schanda,* 352

id. 36.) The bill of exceptions contains no motion for a new trial. This was a jury trial, and such a motion, with an adverse ruling thereon and an exception to the ruling, was necessary to be preserved in the bill of exceptions in order to save for review the question of the sufficiency of the evidence to sustain the verdict. (*People* v. *Buckman,* 357 Ill. 407; *People* v. *Reese,* 355 id. 562; *People* v. *Leonardi,* 338 id. 177; *People* v. *Gabrys,* 329 id. 101.) The only questions for review, therefore, are those with respect to errors alleged to have been committed upon the trial as shown in the bill of exceptions.

During the cross-examination of a witness for the plaintiffs in error he was asked what his business was, and he replied that he was in the tobacco business. He was then asked if he was in the liquor business and replied in the negative. Following that question he was asked, "Alcky business?" and replied in the negative. The next question was, "You have been down to the Federal business, haven't you?" To the question an objection was interposed and sustained. One of the attorneys for the plaintiffs in error then asked that the jury be instructed to disregard any inference. The court gave no instruction but merely remarked, "Sustained." It is contended that the purpose of the questions was to create prejudice in the minds of the jury against the witness and against the plaintiffs in error, and that it would have that effect even though the objection was sustained. The last question was not answered. The witness had answered the previous questions, stating that he was not engaged in the liquor business. Neither from the previous answers nor the question which was not answered could any inference be drawn harmful to the plaintiffs in error. This point is not well taken. *People* v. *May,* 269 Ill. 417.

Upon counsel's objection to the assistant State's attorney's practice of repeating answers made by a witness the court instructed the assistant State's attorney to omit the

repetition. The assistant State's attorney said, "Of course, I want the jury to understand everything about it." That remark was objected to, and the assistant State's attorney replied, "That is the only reason I had for repeating them." One of the attorneys for the plaintiffs in error requested a ruling upon his objection. The court overruled the objection and an exception was preserved. The purpose of the questions was to bring out facts pertinent to the issue which the attorney desired the jury to hear. It does not appear that there was any necessity for repeating the answers if the court, jury and attorneys could hear the answers made by the witness, but if the answers were proper it is not apparent how their repetition would prejudice the plaintiffs in error. The court's admonition to the assistant State's attorney was proper, and even if the latter's statement was not necessary as an explanation, it is not perceived how it was prejudicial or required any further adverse ruling by the court.

The witness Vera Walush had answered, on direct examination, that she sold groceries, canned goods, smoked fish, candy and cigars. On cross-examination she was asked whether it was not a fact she sold whisky to two men whose names were stated and whether that was not a part of her business in the previous April. Objections to the questions were sustained. Cross-examination is largely within the discretion of the trial court. (*People* v. *Matthews*, 359 Ill. 171.) A cause will not be reversed for alleged improper rulings on questions asked on cross-examination unless the defendant has been prejudiced or deprived of a fair trial. (*People* v. *Marvin*, 358 Ill. 426; *People* v. *Jones*, 343 id. 291; *People* v. *Miller*, 342 id. 244.) The plaintiffs in error were not prejudiced by the ruling of the court.

We find no prejudicial error in the record, and the judgment of the criminal court is affirmed.

*Judgment affirmed.*